PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3413
_____

UNITED STATES OF AMERICA

v.

ALEXANDER NAVEDO,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 10-cr-00359-002)
District Judge:  Hon. Garrett E. Brown, Jr.
_____

Argued on April 11, 2012

Before:  McKEE, *Chief Judge*, HARDIMAN, *Circuit Judge*,
and JONES, II, *District Judge**

(Opinion Filed: September 12, 2012)

Darren M. Gelber, Esq.  (argued)
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ 07095

*Attorney for Appellant*

Paul J. Fishman

_____

* Hon. C. Darnell Jones, II, District Judge of the United States
District Court for the Eastern District of Pennsylvania, sitting
by designation.

United States Attorney
John F. Romano, Esq. (argued)
        Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

        *Attorneys for Appellee*

_____

OPINION OF THE COURT
_____


McKEE, *Chief Judge*:

        Alexander Navedo appeals the denial of a motion to suppress weapons that police discovered in his home after a warrantless arrest.  He argues that he was detained without reasonable suspicion or probable cause to arrest and that the weapons that were subsequently recovered from his apartment should therefore have been suppressed.  We agree.

## I.    BACKGROUND

        On March 3, 2010, Henry Suarez and Saul DeLaCruz, two Newark Police Department detectives, set up surveillance in front of 315 Park Avenue in Newark, New Jersey.  They were in plain clothes and driving an unmarked car.  Although they were in front of 315 Park Avenue, they were actually investigating a shooting that had occurred at 323 Park Avenue two months earlier in January.  315 Park Avenue is a multi-unit building located in a mixed residential and industrial neighborhood.  The officers arrived at approximately 7:30 to 8:00 pm; street lights were on and the streets were well illuminated when they arrived.

        The area is not a "high crime area," and the police did not have a description of anyone involved in the January shooting.[1]  Before arriving and setting up their surveillance,

_____

[1] In addition to the shooting in January, the government relies on a February 3, 2010 weapons complaint to police by a

2

the police had no knowledge or information whatsoever about Alexander Navedo. Rather, Officer Suarez testified that they set up surveillance in the area and maintained a presence because of concerns that there may be some kind of retaliation for the January shooting. J.A. at 32.

At approximately 8:30 pm, the detectives saw a man (later identified as Navedo) come out of the entrance to 315 Park Avenue and stand on the porch, approximately twenty to thirty feet from their unmarked parked car. Officer Suarez testified that Navedo was not doing anything unusual. Soon thereafter, a person later identified as Co-defendant Pozo, approached Navedo from the street. Pozo was carrying a bookbag, and Navedo walked down to speak with him. According to Officer DeLaCruz's suppression testimony, the conversation seemed cordial and friendly, and nobody appeared threatened or threatening. J.A. at 84. After a few minutes, Pozo took the bag he was carrying off his shoulder, reached inside it, and pulled out an object. The officers then observed Pozo holding what looked like a silver gun with a black handle. Navedo never touched or possessed the gun. In fact, it never left Pozo's hands, and neither officer observed any conduct that would have suggested that Navedo was doing anything illegal.[2] According to Detective Suarez's testimony at the suppression hearing, right before the police

woman claiming that her boyfriend threatened her with a gun, to support its contention that reasonable suspicion existed as to Navedo. *See* Appellee Br. at 2, 15; Reply Br. at 1-2. But as discussed below, despite these isolated incidents—none of which involved Navedo—nothing in the record supports a finding this neighborhood was a high crime area, and the District Court made no such finding.

[2] Detective Suarez testified that "[w]e didn't know what was going on at that time, all we saw was just the weapon and two individuals walking up to the single person on the porch. So, that's why we decided to get out of the vehicle." J.A. at 50. He further explained: "we wasn't going to wait until he actually pulled the gun out completely. We wanted to have the advantage, that's why we jumped out of our vehicle to make sure they didn't go any further than that and tried to keep that weapon inside the bag." *Id*. at 51.

3

approached the group, Navedo "was just leaning forward to see what was inside the bag." J.A. at 52.

Upon seeing what they believed was a gun, the officers got out of their car and approached Navedo, Pozo, and Pozo's companion. As they approached a fence surrounding the building, the officers identified themselves. The officers were able to clearly see that the object Pozo had in his bookbag was indeed a gun before Pozo quickly threw it back into his bag and ran. Detective Suarez chased Pozo and ultimately overtook him and placed him under arrest.

As Detective Suarez was pursuing Pozo, Navedo ran up the stairs to his home with Officer DeLaCruz pursuing him into the building and up some stairs. DeLaCruz testified that he chased Navedo into the house because he (the detective) thought Navedo was involved in an illegal gun transaction. J.A. at 88. As he chased Navedo, DeLaCruz yelled: "Police. Stop." J.A. at 69. With DeLaCruz in pursuit, Navedo climbed two flights of stairs, reached the third floor, and attempted to open the door to his apartment. As Navedo was opening the front door to his apartment, he was tackled by DeLaCruz. Officer DeLaCruz testified that "the physical contact was as [Navedo] was opening his front door—or his door to his apartment . . . ." J.A. at 92. The following exchange occurred during the suppression hearing:

> **Q.** And as you chased him up to the third floor, the door that he turned towards, when he got there, was it opened or closed?
> **A.** From my vantage point, I saw him turn it open.
> **Q.** Okay. And so when you—when you tackled him, was that door opened or closed?
> **A.** It was opened.

J.A. at 69-70.

After DeLaCruz tackled Navedo, both men fell to the ground and landed inside the apartment. Officer DeLaCruz testified that he handcuffed Navedo, and then observed a shotgun, two long rifles on the bed, one on the floor, and a stock of ammunition on the floor. He explained:

4

After I detained the defendant, after I detained him, during the small little encounter, that's when I observed like a shotgun on the bed, two—two long rifles on the bed, one on the floor, and just an enormous amount of ammunition on the floor. At that point in time, we both stood up, I was able to detain him quickly.

J.A. 70.[3]

After hearing the testimony of the two detectives, Navedo, and a defense witness, the court denied Navedo's suppression motion. The court ruled that the officers had reasonable suspicion to stop Navedo and to question him because Navedo was looking at a weapon in Pozo's bag. The District Court reasoned that Navedo's flight elevated the reasonable suspicion that justified the initial approach to "probable cause for arrest and justified entry" into the apartment under the theory of hot pursuit. J.A. at 142. The court ruled that the physical evidence obtained inside Navedo's apartment was admissible because there was probable cause to arrest Navedo, based upon his flight. The court explained: "The individuals ran, creating probable cause for arrest and justified entry, hot pursuit into the apartment. There certainly was a reasonable suspicion of criminal activity, combined with flight looking at the totality of the circumstances." *Id.* The Court then summarized: "I do find probable cause here based upon the reasonable suspicion, together with the flight." *Id.* at 144.

Navedo was charged with illegally possessing the weapons that were recovered from inside his apartment, and those weapons were admitted against him to support the sole count upon which he was tried and convicted. Navedo now appeals the resulting conviction.[4]

---

[3] It appears that the District Court found that the third person escaped. *See* J.A. at 140.

[4] The District Court had jurisdiction under 18 U.S.C. § 3231. Our review is proper pursuant to 28 U.S.C. § 1291.

We review a district court's order denying a motion to suppress under a mixed standard of review, exercising

5

## II.     DISCUSSION

As we noted at the outset, Navedo's sole contention on appeal is that the District Court erred in denying his suppression motion. He claims that the police did not have probable cause to arrest and therefore the evidence that was seized upon their warrantless entry into his apartment should have been suppressed.

## A. GOVERNING PRINCIPLES.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The Fourth Amendment thus requires a warrant based upon probable cause before police can arrest someone (subject to certain exceptions). "While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made 'on the spot' under pressure and do 'not require the fine resolution of conflicting evidence [required at a trial].'" *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)).

However, the realities of law enforcement allow police officers to briefly detain an individual based upon "articulable suspicion" and then to perform a limited protective "patdown" for weapons during that detention "where a police

plenary review over legal determinations and reviewing findings of fact for clear error. *United States v. Lewis*, 672 F.3d 232, 236-37 (3d Cir. 2012).

6

officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Although the limited protective search or patdown is allowed if the officer has "reasonable grounds" to believe that a person is "armed and dangerous," the Fourth Amendment limits the scope of that search. *Id.* It must be a "carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him [or her]." *Id.*

The brief investigative detention is permissible if "the police officer [can] point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.*

In evaluating whether reasonable suspicion existed, a court "must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).[5]

The reasonable suspicion required under *Terry* is specific to the person who is detained. The circumstances "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981). The Supreme Court has never viewed *Terry* as a general license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion. Rather, the Court has stressed that "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence*." *Id.* (alteration in original) (quoting *Terry*, 392 U.S. at 21 n.18) (internal quotation marks omitted).

We do not suggest that the officers had to sit idly by without approaching and investigating merely because they could not be certain about what was transpiring. However,

---

[5] We need not reach Appellant's argument that the District Court improperly accepted the testimony of the testifying officers over witnesses more sympathetic to Navedo.

given the limitations on investigative detentions under *Terry*, and the Court's clear pronouncement in *Cortez*, they could not detain Navedo merely because their reasonable suspicions justified a brief investigative detention of Pozo.

The detectives conceded during the suppression hearing that they had no information about Navedo. In addition, the detectives conceded that when they left their unmarked car to investigate, Navedo had until then merely looked at the gun that Pozo was showing him and engaged in brief conversation with Pozo and his companion. J.A. at 41-47. That would not justify a reasonable suspicion as to Navedo without more than appears on this record.

We are mindful that "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, that does not negate the limitations endemic in *Terry* as the Court emphasized in *Cortez*.

Here, police did not have any information from any source that would have supported a reasonable suspicion that Navedo was involved in firearms trafficking or that he intended to purchase a gun from Pozo. As we have just noted, the officers knew of nothing that would have suggested Navedo was connected to any prior criminal activity.[6] His residence at 315 Park Avenue was not even the focus of police surveillance. That surveillance was aimed at the building at 323 Park Avenue. A shooting had been reported

---

[6] For reasons known only to the Government, the Assistant United States Attorney who drafted the Appellees's brief in this case saw fit to inform this Court that: "[p]rior to this incident, Navedo had amassed a significant criminal record, including convictions for endangering the welfare of a child, grand theft auto, and possession of controlled dangerous substances." Appellee Br. at 3. However, the Government does not suggest that either of the detectives involved in this case had any prior knowledge of any of the individuals involved in this case including Navedo, and the record here is clearly to the contrary. We therefore are at a loss to understand why the Government would think it relevant or proper to include such a gratuitous statement in its brief.

at that address, and the shooting was not even that recent. The stop here appears to be based on nothing more than an attempt to transfer the reasonable suspicion the police had as to Pozo onto Navedo.[7] Yet, as the Supreme Court explained in *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person ." There, the Court stated: "Notwithstanding the absence of probable cause to search Ybarra, the State argues that the action of the police in searching him and seizing what was found in his pocket was nonetheless constitutionally permissible. . . . We are unable to take even the first step required by this argument." *Id.* at 92. Although the Court in *Ybarra* was discussing probable cause to arrest rather than the reasonable suspicion for a stop under *Terry*, the Court's pronouncement is equally applicable to this situation. *See Brown v. Texas*, 443 U.S. 47, 49-52 (1979).

Here, the District Court concluded that Navedo's flight gave rise to the police probable cause to arrest. Accordingly, we must determine whether flight under the circumstances here, gave Detective DeLaCruz probable cause to arrest Navedo.[8]

## B. NAVEDO'S FLIGHT.

---

[7] Navedo concedes the police officers may have had at least reasonable suspicion to conduct a *Terry* stop of Pozo based on his possession of a weapon. *See* Reply Br. at 5-6 ("While Pozo's possession of the gun clearly called for reasonable suspicion, if not probable cause, to detain Pozo, these factors simply do not give rise to a reasonable suspicion that Navedo was doing anything other than standing next to Pozo.").

[8] Detective DeLaCruz's testimony regarding the arrest was not very precise. However, it appears from his testimony that he "detained" Navedo before he saw the guns which would have been in plain view after Navedo opened his door while fleeing into his apartment from the detective. J.A. at 69-70. However, since we conclude that there was no probable cause to arrest Navedo in the first place, we need not attempt to determine whether DeLaCruz saw the weapons before or after he arrested him.

9

In *Illinois v. Wardlow*, 528 U.S. 119 (2000), the Supreme Court discussed when "unprovoked flight" could lead to a warrantless arrest. There, officers patrolling an area known for heavy narcotics trafficking observed Wardlow holding an opaque bag as he stood next to a building. *Id.* at 121-22. Wardlow fled after seeing the police officers, but two of the officers caught up with him, and briefly detained him. *Id.* at 122. Upon stopping him, they conducted a patdown search for their own protection because, in their experience, "it was common for there to be weapons in the near vicinity of narcotics transactions." *Id.* While conducting the patdown an officer "squeezed the bag [Wardlow] was carrying and felt a heavy, hard object similar to the shape of a gun." *Id.* Inside that bag, the officers discovered a .38-caliber handgun with five live rounds of ammunition and they arrested Wardlow. *Id.*

The trial court denied Wardlow's suppression motion and he appealed the resulting conviction for illegal possession of the firearm, arguing that it had been seized improperly.

The Illinois Supreme Court affirmed the reversal of the trial court's denial of Wardlow's suppression motion. The Illinois Supreme Court agreed with the intermediate appellate court's ruling "concluding that the gun should have been suppressed because the [police] did not have reasonable suspicion sufficient to justify an investigative stop pursuant to *Terry*." *Id.* The court relied on *Florida v Royer*, 460 U.S. 491 (1983), in explaining that "sudden flight in [a high crime area] does not create a reasonable suspicion justifying a *Terry* stop." *Wardlow*, 528 U.S. at 122. Since the United States Supreme Court in *Royer* had held that an individual may ignore police questioning and simply go on his/her way, the Illinois Supreme Court concluded that "flight may simply be an exercise of [that right] and, thus, could not constitute reasonable suspicion justifying a *Terry* stop." *Wardlow*, 528 U.S. at 122-23. The Illinois high court had refused to hold that the fact of being in a high crime area supported a finding of reasonable suspicion, sufficient to support an investigative stop even though such flight "standing alone" would not justify the stop. *Id.* at 123.

The United States Supreme Court disagreed. That Court reasoned that: "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id*. at 125. The Supreme Court held that, under the circumstances there, Wardlow's flight was sufficient to allow the police to detain him and investigate further. *Id*. ("Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further."). However, it was the information that the police obtained during the brief investigative stop that allowed the brief *Terry* detention to blossom into probable cause for arrest. Even under the far more suspicious circumstances there, Wardlow's flight did not justify an arrest. Rather, the Court explained: "Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Id*.

In his opinion concurring in part and dissenting in part, Justice Stevens explained that in reaching its holding, the majority had rejected both the bright line *per se* rule advocated by the Government, and the opposing *per se* rule that the defendant advocated. 528 U.S. at 126-27 (Stevens, J., concurring in part and dissenting in part). The Government had argued that the Court should allow a *Terry* stop whenever "anyone . . . flees at the mere sight of a police officer," and the defendant had asked the Court to hold that "the fact that a person flees upon seeing . . . police can never, by itself, . . . justify a temporary investigative stop." *Id.* at 126. Justice Stevens explained: "[t]he Court today wisely endorses neither *per se* rule. Instead, [it concludes reasonable suspicion] . . . must be determined by looking to 'the totality of the circumstances—the whole picture." *Id*. at 126-27.

Justice Stevens further explained that the appropriate *Terry* inquiry when one flees from police must address "the degree of suspicion that attaches to a person's flight—or, more precisely, what commonsense conclusions can be drawn [from it]." *Id*. at 128 (internal quotation marks omitted). He detailed several possible motivations for flight—some of which were innocent and innocuous and some of which were not. *Id.* at 128-30.

He then quoted century-old precedent to explain why flight could not always be equated with guilt:

> [I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that "the wicked flee when no man pursueth, but the righteous are as bold as a lion."

528 U.S. at 131 (quoting *Alberty v. United States*, 162 U.S. 499, 511 (1896)) (internal quotation marks omitted). He stressed that this was particularly true in view of the modern tensions between police and certain demographic groups. "Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, . . . believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence." *Id.* at 132.[9]

It is therefore clear from the discussion by both Justice Stevens and the majority that *Wardlow* cannot be used to justify stopping everyone who flees from police. A careful reading of the majority's opinion makes this abundantly clear. The majority stressed the underlying circumstances of the investigative detention at issue in upholding the investigative stop of Wardlow. The Court explained:

> [Officers] Nolan and Harvey were among eight officers in a four-car caravan that was converging on an area known for heavy narcotics trafficking, and the officers anticipated encountering a large number of people in the area, including drug customers

---

[9] In a lengthy footnote, Justice Stevens cited several articles and studies that document the extent to which Black and Latino residents of certain communities are distrustful of police and the problems that arise from the distrust. *See id*. at 132 n.7.

and individuals serving as lookouts. *It was in this context* that Officer Nolan decided to investigate Wardlow after observing him flee.

*Id.* at 124 (majority opinion) (emphasis added) (citation omitted). It must be remembered that the context the Court was explaining justified a brief investigative stop under *Terry*. The Court did not suggest that flight under those circumstances would have been sufficient to arrest Wardlow without more; and it is clear from the Court's discussion that it would not have been adequate for the probable cause required for an arrest.

As we noted earlier, when police saw Wardlow, he was holding an opaque bag. Since police had every reason to believe that the people assembled on the sidewalk included drug dealers and their customers, Wardlow's flight "*in this context*," would certainly give rise to a reasonable suspicion that he was fleeing because of what was in the bag. Accordingly, police could legally investigate and they could take reasonable and limited precautions to ensure their safety during the brief stop required for that investigation. There, police could not be reasonably sure of their safety during the stop without taking steps to determine if Wardlow had a weapon in the bag he was carrying. Once they felt what appeared to be a weapon, the circumstances of its discovery gave them probable cause to believe that Wardlow was engaged in illegal activity and he was arrested.

None of these circumstances are present here. This was not the proverbial "high crime area," and police had no reason to suspect that Navedo was demonstrating anything other than curiosity at the sight of a gun in Pozo's backpack. *See, e.g.*, *United States v. Goodrich*, 450 F.3d 552, 561 (3d Cir. 2006) (*Terry* stop in an area with a reputation for theft of anhydrous ammonia after ten to fifteen previous reported thefts of the chemical). The evidence of a prior shooting in January and a report of a domestic disturbance involving a gun in February, without more, did not provide sufficient evidence to conclude that the area surrounding 315 Park Avenue was a high crime area, and as we noted earlier, the District Court made no finding that this was a high crime area. This is also not the case in which police officers patrolled an area known for

13

heavy narcotics trafficking where police expected to encounter drug dealers, their customers, or "lookouts" as in *Wardlow*.

We do not mean to suggest that the outcome would be different here if this had happened in a "high crime area," nor do we suggest that police should ignore the overall character of a neighborhood when assessing the significance of "unprovoked flight." We just note that the discussion in *Wardlow* does not suggest that someone's unprovoked flight will necessarily justify a *Terry* stop merely because that person happens to reside in a high crime area. In fact, as Justice Stevens explains at some length, persons residing in such areas may be particularly apprehensive of police for reasons totally unrelated to their own involvement in a crime. Rather, such flight and the setting in which it occurs, is merely one of many factors police may reasonably consider before making an investigative stop under *Terry*. The flight must, however, still be assessed in context with *all* of the circumstances surrounding it. *See Wardlow*, 528 U.S. at 124.

But, even absent a finding of a high crime area or other relevant characteristics, the Government interprets *Wardlow* to hold that flight in and of itself is sufficient to establish probable cause. In doing so, the Government relies in part on *United States v. Laville*, 480 F.3d 187 (3d Cir. 2007). *See* Appellee Br. at 18. The argument misinterprets *Wardlow*. As we have previously stated, "the Supreme Court has never held that unprovoked flight alone is enough to justify a stop." *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) (discussing flight in the context of a vehicle stop).

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the [initial] stop." *Wardlow*, 528 U.S at 123. We have explained that "flight upon noticing police, *plus some other indicia of wrongdoing*, can constitute reasonable suspicion." *Bonner*, 363 F.3d at 217 (emphasis added). Despite the government's reliance on *Laville*, we have not held that mere unprovoked flight from

14

approaching police would support probable cause to arrest, nor could we, given the Supreme Court's pronouncements.

In *Laville*, we did state that: "It is well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers *generally* no longer have mere reasonable suspicion, but probable cause to arrest." 480 F.3d at 195 (emphasis added) (internal quotation marks omitted). There are two problems with the Government's reading of *Laville*. First, it does not apply here with the force the Government believes because, as we have explained, the reasonable suspicion supporting the stop focused on Pozo, not on Navedo. Second, the Government's position ignores our cautionary note that flight will "generally" support probable cause. Whether that higher threshold is reached must, of course, turn on an examination of the totality of the circumstances surrounding the flight, as well as the nature of the conduct that gave rise to the underlying reasonable suspicion for the investigative stop.

In *Laville*, Virgin Islands police received a telephone call informing them that a boat carrying thirty-two undocumented aliens had run aground on a reef and that several of the aliens were coming ashore. *Id.* at 189. Laville was subsequently arrested and convicted of conspiring to bring illegal aliens into the United States for financial gain. Prior to trial, Laville moved to suppress certain evidence arguing that he was arrested without probable cause, and we affirmed the District Court's denial of that suppression motion. In rejecting Laville's argument that his stop and arrest violated the Fourth Amendment, we explained that when police Officer Santos arrived at the wharf in question, he confirmed that a boat had run aground and was stranded with people still onboard. *Id.* at 194. A witness had pointed out four individuals who identified themselves as Cubans who had been on the stranded boat and they told the officer that others were still onboard. *Id.* The officer confirmed that persons suspected of being on the boat were "around the corner," and the witness offered to "point them out." *Id*. at 194 (internal quotation marks omitted). The officers then walked around the corner and saw Laville and his

15

companions, who fled as the officers approached. *Id.* at 194-95. "Taking these facts together with all reasonable inferences, . . . Santos . . . had, at the very least, reasonable suspicion to believe that criminal activity was afoot." *Id.* at 195 (citation omitted). We stated that that reasonable suspicion would have justified a brief detention to investigate under *Terry* even absent any additional information. *Id.* However, Laville's subsequent attempt to leave when Santos approached under these circumstances "elevated Santos's reasonable suspicion to the level of probable cause for an arrest."I*d.*

Contrary to the Government's reliance on *Laville*, the facts there demonstrate the type of information police need before flight can, by itself, elevate reasonable suspicion to probable cause. We explained that although "[t]he arresting officer need not have contemplated the specific offense for which the defendant ultimately will be charged," the officer must have "reasonably trustworthy information or circumstances within an arresting officer's knowledge . . . to warrant a person of reasonable caution to conclude that an offense has been or is being committed *by the person being arrested*." *Id.* at 194 (emphasis added). The officers in *Laville* had tips from a citizen informant as to the specific identity of a person suspected of entering the country illegally and the knowledge that a boat had run aground moments before the arrests. Moreover, the arrest in *Laville* occurred in the Virgin Islands and was therefore tantamount to a border search that requires far less justification than an arrest that does not implicate the nation's interest in the security of its borders. *See United States v. Hyde*, 37 F.3d 116, 122 (3d Cir. 1994) ("[W]e perceive the interest of the United States in warrantless searches without probable cause at this 'internal' border to be little different from its interest in such searches at its international borders.") (explaining that the geographical location of the Virgin Islands meant that police were afforded greater leeway in conducting warrantless searches).[10] The facts here are a far cry from the circumstances that justified the stop and arrest in *Laville*.

---

[10] In *Hyde*, we upheld the constitutionality of *suspicionless* customs checkpoints at the airports in the Virgin Islands. *Hyde*, 37 F.3d at 117, 123.

16

Our holding today reiterates that unprovoked flight, without more, can not elevate reasonable suspicion to detain and investigate into the probable cause required for an arrest. Rather, a person whom police approach is free to avoid a potential encounter with police by leaving the scene, and the rate of acceleration of the person's gate as s/he leaves away is far too ephemeral a gauge to support a finding of probable cause, absent some other indicia of involvement in criminal activity. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Royer*, 460 U.S. at 497-98 ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (citations omitted)). Unprovoked flight can only elevate reasonable suspicion to probable cause if police have "reasonably trustworthy information or circumstances" to believe that an individual is engaged in criminal activity, as was the case in *Laville.* 480 F.3d at 194.

As discussed at length above, none of those circumstances are present here. The police had no reason to suspect that Navedo was himself involved in criminal activity, and even if they had appropriately formed such a suspicion, they would only have been entitled to detain and investigate, not arrest. We conclude, therefore, that the police lacked probable cause to arrest Navedo under the circumstances here and that the District Court erred in denying his motion to suppress the physical evidence that was seized following that arrest.

III.  **CONCLUSION**

For the reasons set forth above, we will remand this case to the District Court with instructions that it vacate the order denying Navedo's motion to suppress.[11]

---

[11] Since we conclude that the arrest was not supported by probable cause, we need not reach Navedo's argument that the police violated the Fourth Amendment when they entered his apartment building during the chase that preceded his arrest.

17

*USA v. Navedo*, No. 11-3413
HARDIMAN, *Circuit Judge*, dissenting.

The majority reverses the District Court's decision to deny Alexander Navedo's motion to suppress evidence after finding that Newark police officers Saul De La Cruz and Henry Suarez (the Officers) did not possess reasonable suspicion to believe Navedo was about to engage in criminal activity. My disagreement with that finding necessitates this respectful dissent.

I

A

Reasonable suspicion requires "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). While officers may not rely on an "inchoate . . . suspicion or hunch," *Terry v. Ohio*, 392 U.S. 1, 27 (1968), it is well-established that they may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person,'" *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quoting *Cortez*, 449 U.S. at 417–18). Accordingly, reasonable suspicion does not require evidence of a crime and need not be based on purely nefarious conduct. "[E]ven factors independently 'susceptible to innocent explanation' can collectively amount to reasonable suspicion." *United States v. Brown*, 448 F.3d 239, 252 (3d Cir. 2006) (quoting *Arvizu*, 534 U.S. at 273).

My colleagues conclude that the Officers' pre-flight observations could not reasonably have led them to suspect that Navedo was about to engage in criminal activity. They

1

do so in spite of their concession that the Officers had reasonable suspicion as to another party to the encounter, Juan Pozo. (*See* Maj. Typescript at 8, 9–10.) In doing so, the majority fails to acknowledge critical portions of the Officers' testimony and usurps the factfinding province of the District Court.

According to the Officers, both of whom were deemed credible by the District Court, around 8:30 p.m., they noticed Navedo exit 315 Park Avenue and stand at the top of the stairs to his porch. Officer Suarez testified that drug purchasers often wait for deliveries outside their homes in this manner. Moments later, Pozo and another man approached Navedo and spoke to him for several minutes; the interaction appeared "cordial" and "friendly." Pozo then opened a backpack and began to withdraw what "appeared [to both Officers] to be a gun" and a holster. (JA 36, 64, 88.) Navedo never touched the gun, but he "lean[ed] forward to see what was inside the bag" and looked unsurprised to see the gun. (JA 51–52, 67, 89.) Conceding that Navedo "had not engaged in any illegal activity, per se" at that point, (JA 46–47), "the way [Pozo and Navedo] were both speaking to each other, the way the weapon was taken out of the backpack being shown, . . . [and] the interest [Navedo] showed towards the weapon" led Officer De La Cruz to believe that "a gun transaction was going to transpire," (JA 88–89). The District Court explicitly credited De La Cruz's testimony that he saw Navedo "being shown the gun in what appeared to be a gun transaction." (JA 140–41.)

I find nothing in the record that would permit us to overturn the District Court's finding that the Officers suspected Pozo and Navedo were about to engage in a gun transaction. Nor can I conclude that it was unreasonable for

2

them to infer that such a gun sale was likely criminal under New Jersey law. In New Jersey, "[n]o person shall . . . receive, purchase, or otherwise acquire a handgun unless [he] . . . is licensed as a dealer . . . or has first secured a permit to purchase a handgun." N.J. Stat. Ann. § 2C:58-3(a). Crucially, when the legality of a gun transaction, or even mere possession, "depends on . . . a license or permit[,]" New Jersey law "presume[s] that [the individual involved] does not possess such a license or permit . . . until he establishes to the contrary." *Id.* § 2C:39-2(b). Therefore, the Officers' suspicion that Pozo's and Navedo's actions denoted illegal enterprise was reasonable.[1]

---

[1] That reasonable suspicion existed does not mean the Officers required such suspicion at the time they approached Navedo's porch. "A seizure does not occur every time a police officer approaches someone to ask a few questions. Such consensual encounters are important tools of law enforcement and need not be based on any suspicion of wrongdoing." *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003); *accord United States v. Drayton*, 536 U.S. 194, 204–05 (2002); *Florida v. Royer*, 460 U.S. 491, 497 (1983). Officers may "pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means"—without effecting a seizure. *Drayton*, 536 U.S. at 201. Confronted with a so-called "consensual encounter," an individual may "'decline to listen to the questions at all and . . . go on his way.'" *United States v. Bonner*, 363 F.3d 213, 217–18 (3d Cir. 2004) (quoting *Royer*, 460 U.S. at 498). Reasonable suspicion is required only when officers conduct an investigatory stop

B

After concluding that no reasonable suspicion existed as to Navedo, the majority devotes a substantial portion of its opinion to explaining that Navedo's flight could not, by itself, establish probable cause to arrest him. (*See* Maj. Typescript at 16–20.) This is undoubtedly correct. *See Illinois v. Wardlow*, 528 U.S. 119, 124–26 (2000) (indicating that flight alone is insufficient to satisfy the lesser standard of reasonable suspicion); *accord United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("[T]he Supreme Court has never held that unprovoked flight alone is enough to justify a stop."). But because the Officers *did* have reasonable suspicion before Navedo fled, this case turns on whether Navedo's flight *in addition to* the facts known to the Officers when they approached the porch rose to the level of probable

---

pursuant to *Terry*, 392 U.S. 1. *See, e.g.*, *Cortez*, 449 U.S. at 417–18.

Here, the Officers initiated a consensual encounter, and Navedo did not merely decline to participate. *See, e.g.*, *Royer*, 460 U.S. at 497–98. Nor did Navedo submit to subsequent displays of the Officers' authority and stop to be questioned pursuant to *Terry*. Accordingly, under *California v. Hodari D.*, 499 U.S. 621, 626 (1991), no seizure occurred until he was tackled in the doorway to his room. Thus, the Officers' reasonable suspicion is relevant only insofar as it informs our probable-cause analysis; reasonable suspicion was neither necessary to the Officers' pre-flight actions nor sufficient to render Navedo's ultimate seizure and arrest constitutional.

4

cause.  *See United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007); *cf. Wardlow*, 528 U.S. at 124 (holding that flight combined with other suspicious circumstances can create reasonable suspicion).  I believe our decision in *Laville* governs our analysis of whether the Officers had probable cause to arrest Navedo.

In *Laville*, an eyewitness on a wharf in the Virgin Islands had reported to police that a boat had run aground and illegal aliens were coming ashore.  480 F.3d at 189.  When police responded to the scene, the witness was able to point out four of the recently arrived individuals sitting on a nearby boardwalk.  *Id.*  Those individuals informed police that they were Cuban and that other aliens who had arrived on the beach with them were still in the area.  *Id.*  The eyewitness offered to identify several of the aliens he claimed were around a corner from the boardwalk.  *Id.*  When police approached three men the eyewitness had identified, the men "stood up and started walking away really fast."  *Id.* at 190.  Soon after, the men began running.  *Id.*  When Laville, one of the fleeing suspects, yielded to an officer yelling at him to stop, he was arrested.  *Id.*  In reviewing the constitutionality of Laville's arrest, we concluded that "by the time [the officer] approached Laville and his companions on the boardwalk, he had, at the very least, reasonable suspicion to believe that criminal activity was afoot."  *Id.* at 195.  It followed that "when Laville fled at the sight of the approaching officers, [they] no longer merely had reasonable suspicion . . . ; [they] now had probable cause to make an arrest."  *Id.*  We explained that "'where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the

5

officers *generally* no longer have mere reasonable suspicion, but probable cause to arrest.'"[2] *Id.* (emphasis added) (quoting *United States v. Sharpe*, 470 U.S. 675, 705 (1985) (Brennan, J., dissenting).

I agree with the majority that whether reasonable suspicion escalates to probable cause when a suspect flees police is context-dependent and must be determined on a case-by-case basis. In the Supreme Court's words, "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are *proper factors* to be considered in the decision to make an arrest." *Sibron v. New York*, 392 U.S. 40, 66–67 (1968) (emphasis added); *accord United States v. Cruz*, 910 F.2d 1072, 1077 (3d Cir. 1990). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124.

I also agree that suspects may at times run from police for innocent reasons. For example, where the investigating officer "insufficiently or unclearly identifies his office or his mission," "the [suspect's] flight . . . must be regarded as ambiguous conduct." *Wong Sun v. United States*, 371 U.S.

---

[2] Other circuits have likewise concluded that reasonable suspicion may escalate to probable cause upon the suspect's flight from police. *See Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003); *United States v. Dotson*, 49 F.3d 227 (6th Cir. 1995); *United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991); *United States v. Martinez-Gonzalez*, 686 F.2d 93 (2d Cir. 1982).

6

471, 482 (1963). But that is not what occurred in this case. Here, although the Officers were dressed in plain clothes, they displayed their badges and verbally identified themselves as Newark police officers. Accordingly, the Officers could reasonably interpret Navedo's immediate flight as evidence of a guilty conscience.

As in *Laville*, the Officers here had information suggesting the possibility of a crime in progress before they approached the suspects. The conduct underlying their suspicions was not itself *per se* illegal, but their professional experience suggested that criminal activity was afoot. The Officers saw Navedo waiting on his front porch, where he appeared to be expecting someone. They deemed this behavior consistent with narcotics sales protocols based on their law enforcement expertise. They observed Pozo's arrival with a backpack, the ensuing conversation, Pozo's display of what appeared to be a gun, and Navedo's expression of interest in the gun. Instead of receiving information from an eyewitness as did the police in *Laville*, here the Officers personally observed facts that led them to possess reasonable suspicion that criminal activity was afoot. The majority attempts to distinguish *Laville* by analogizing the arrest there to "a border search that requires far less justification." (Maj. Typescript at 19.) But the word "border" does not even appear in our opinion in *Laville*. There we applied the usual probable-cause standard and concluded that it had been satisfied. 480 F.3d at 194–95. Probable cause has likewise been established in this case.

After concluding that the Officers' reasonable suspicion became probable cause when Navedo fled, the question becomes whether the Officers were authorized to pursue Navedo into 315 Park Avenue. I would hold that the

7

Officers' "hot pursuit" of Navedo into his apartment building constituted a valid exigent circumstance that permitted them to disregard the warrant requirement.[3] *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *United States v. Santana*, 427 U.S. 38, 42–43 (1976) (holding that where probable cause to arrest exists, "a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper . . . , by the expedient of escaping to a private place"). "Hot pursuit" need not involve "an extended hue and cry 'in and about (the) public streets.'" *Santana*, 427 U.S. at 42–43. "The fact that [a] pursuit . . . end[s] almost as soon as it beg[ins]" because a suspect flees into and is apprehended just inside his own home does not "render it any the less a 'hot pursuit' sufficient to justify the warrantless entry." *Id.* at

---

[3] Due to the nature of Navedo's apartment building, whether he possessed a reasonable expectation of privacy—a necessary predicate to his invocation of the exclusionary rule—might have presented a close question in this case. *See United States v. Correa*, 653 F.3d 187, 188–90 (3d Cir. 2011) ("[A] resident of [a] . . . multi-unit apartment building lacks an objectively reasonable expectation of privacy in the building's common areas" even where there is a "locked exterior door."). But the Government waived this standing argument by failing to raise it in the District Court. *E.g.*, *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) (It is "well-established . . . that arguments not raised in the district courts are waived on appeal . . . [and] [t]his general principle applies fully to criminal cases involving motions to suppress."); *United States v. Stearn*, 597 F.3d 540, 552 n.11 (3d Cir. 2010) (Standing is "subject to the ordinary rule that an argument not raised in the district court is waived on appeal.").

8

43. It matters not that Navedo had only to take a few steps before he was inside his building or that he was tackled and arrested just moments into the chase. Officers suspected him of an illegal gun transaction and knew of at least one gun on the scene, which justified immediate action. *See Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984); *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996).

The two requisites for a warrantless arrest in the home—probable cause and exigent circumstances—were established by the Government in this case. *See Welsh*, 466 U.S. at 749–50; *Payton v. New York*, 445 U.S. 573, 586–90 (1980); *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006). And because the firearms evidence Navedo sought to suppress was in plain view from the Officers' lawful vantage point the instant they tackled Navedo, it was admissible.

II

For the foregoing reasons, I would uphold the District Court's denial of Navedo's suppression motion and affirm the judgment of conviction.

9