******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JEREMY KELLY
(SC 18849)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh,
McDonald and Vertefeuille, Js.*

*Argued April 16, 2013—officially released August 12, 2014*

*Timothy H. Everett*, assigned counsel, with whom, on the brief, were *Blake Holler*, *Victoria Mueller* and *Nicole Vaswig*, certified legal interns, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robert Diaz*, assistant state's attorney, for the appellee (state).

*Richard Emanuel* and *Leonard M. Crone* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Michael A. Blanchard*, *Sandra J. Staub* and *Amy Breglio*, legal intern, filed a brief for the American Civil Liberties Union Foundation of Connecticut as amicus curiae.

*Opinion*

PALMER, J. The defendant, Jeremy Kelly, was convicted, on a conditional plea of nolo contendere; see General Statutes § 54-94a;[1] of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a). The defendant entered his plea following the trial court's denial of his motion to suppress cocaine that the police had discovered after stopping him incident to the detention of another individual, who the police reasonably believed was armed and dangerous and who was the subject of an arrest warrant, while the two men were walking together on a public street. The defendant appealed to the Appellate Court, and that court affirmed the trial court's judgment. *State* v. *Kelly*, 129 Conn. App. 109, 126, 19 A.3d 223 (2011). We granted the defendant's petition for certification to appeal, limited to the following issues: "[1] Whether the Appellate Court properly held constitutional the warrantless seizure of the defendant on a public street because he was in the company of a person believed to be an individual wanted for [a] violation of probation and [2] [W]hether the Appellate Court, in doing so, properly relied on facts not [expressly] found by the trial court when it denied the defendant's motion to suppress . . . ." *State* v. *Kelly*, 302 Conn. 920, 28 A.3d 338 (2011). We agree with the Appellate Court that the trial court properly determined that the police were authorized to stop and briefly detain the defendant, as a reasonable safety measure, in connection with the lawful detention of the individual he was accompanying, because the police reasonably believed that that other individual was armed and dangerous. With respect to the second certified question, that issue has been rendered moot by virtue of an articulation, which the trial court issued in response to this court's order following oral argument, explaining that it had credited certain suppression hearing testimony on which the Appellate Court relied in its recitation of the facts. Because we conclude that the protective stop of the defendant passes muster under both the federal and state constitutions, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts, which were based on testimony adduced at the evidentiary hearing on the defendant's motion to suppress. "On March 27, 2007, Detective William Rivera of the Hartford [P]olice [D]epartment received information from a reliable confidential informant that . . . Pedro Gomez, [who resided] in the area of Brown Street in [the city of] Hartford, was in possession of a firearm. Having also discovered that Gomez was the subject of an outstanding arrest warrant for [a] violation of probation, Rivera and Lieutenant Jose Angeles of the [D]epartment of [C]orrection drove to the area in an unmarked car [while] dressed in plain

clothes. They had a description of Gomez as a Hispanic male of medium complexion with short hair, twenty to twenty-two years of age, between 130 and 150 pounds and between five feet, five inches and five feet, seven inches tall. The informant also had alerted Rivera that [Gomez] sometimes . . . disguised himself by wearing a dark wig.

"At approximately 11 a.m., the officers observed two men, later identified as the defendant and Rafael Burgos, walking and talking together on the sidewalk. There was a gas station on the corner that was a known location for drug dealing, and Rivera suspected that the men had just left that location. As the officers approached, they determined that Burgos fit the description of Gomez. As Burgos and the defendant walked into the driveway at 13-15 Brown Street, they made eye contact with the officers, and Burgos moved his foot as if he was going to run. Both men continued to walk slowly toward the rear of the building, looking backwards. Angeles noticed that the defendant was clutching his waistband. Stopping his vehicle in front of the driveway, Rivera displayed his badge and stated 'I'm a police officer' and 'come to the vehicle.' Angeles also displayed his badge. Burgos replied, 'for what?' and the defendant stated, 'I live here.' Burgos and the defendant continued walking up the driveway. Rivera then pulled the car into the driveway east of 13-15 Brown Street. The officers did not activate [the] vehicle's lights or siren and had not drawn their firearms.

"As Angeles began to step out of the vehicle, he ordered the men to 'stop, stop, come here.' At that point, [Burgos and the defendant] fled. The defendant ran behind the house. Rivera drove the car to the front of 13-15 Brown Street and observed the defendant run around the front of the house and up the street, still clutching his waistband, while Angeles chased him on foot. Rivera drove alongside them up the street and then turned into a driveway to block the defendant's path. The defendant changed course, and Rivera began chasing him on foot. Rivera saw the defendant drop a clear plastic bag containing a white substance [that subsequently was determined to be cocaine]. When the defendant tripped and fell, Rivera tackled him and handcuffed him after a thirty second struggle. Rivera seized the bag that the defendant had dropped and also seized another clear plastic bag containing a large amount of a white, rock like substance from the defendant's clenched hand." (Footnote omitted.) *State* v. *Kelly*, supra, 129 Conn. App. 112–13. The white substance seized from the defendant's hand also was determined to be cocaine.

Thereafter, the defendant was charged with possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes (Rev. to 2007) § 21a-278 (b), possession of narcotics

within 1500 feet of a school in violation of General Statutes § 21a-279 (d), possession of narcotics in violation of General Statutes § 21a-279 (a), interfering with an officer in violation of General Statutes (Rev. to 2007) § 53a-167a, and criminal trespass in the third degree in violation of General Statutes (Rev. to 2007) § 53a-109. The defendant moved to suppress the cocaine, claiming that he had been unlawfully seized because Rivera and Angeles had no reason to believe that the defendant had committed or was committing a criminal offense, and the discovery of the cocaine was the fruit of that illegal seizure.

Following an evidentiary hearing on the defendant's motion to suppress, the trial court denied the motion. In support of its decision, the trial court explained that, because Rivera and Angeles reasonably believed that Burgos was Gomez, they were justified in stopping Burgos in light of the outstanding arrest warrant for Gomez. The trial court further found that, because that warrant was for the offense of "felony . . . possession of a firearm," the officers were authorized to briefly detain the defendant, as a legitimate safety precaution, incident to the lawful stop of Burgos.[2] The trial court reasoned that, when the police lawfully stop a suspect who they reasonably believe may be armed and dangerous, and that suspect is accompanied by a companion, the police also must be permitted to temporarily restrict the companion's freedom of movement lest they place themselves at risk that the companion will "[step] back . . . and open fire" on them. In reaching its conclusion, the trial court analogized the companions of a suspect on a public street to passengers in a vehicle driven by a suspect, who, under *Brendlin* v. *California*, 551 U.S. 249, 255–58, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007), lawfully may be detained incident to the lawful stop of the driver. The trial court concluded that, because the officers had justifiably detained the defendant for safety reasons, the defendant could not prevail on his claim that the cocaine seized by the police following his detention was the fruit of unconstitutional police conduct.

The defendant subsequently entered a plea of nolo contendere to the crime of possession of narcotics with intent to sell in violation of § 21a-277 (a), conditioned on his right to appeal from the trial court's denial of his motion to suppress. See *State* v. *Kelly*, supra, 129 Conn. App. 114. The trial court rendered judgment of conviction in accordance with the plea and sentenced the defendant to nine years imprisonment, suspended after three and one-half years, and three years probation. Id.

The defendant appealed to the Appellate Court from the judgment of the trial court, claiming, inter alia, that the police had detained him in violation of the fourth amendment to the United States constitution[3] and article first, §§ 7[4] and 9,[5] of the Connecticut constitution.

Id. Specifically, the defendant argued that the officers had seized him in violation of *Terry* v. *Ohio*, 392 U.S. 1, 27, 30–31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); see also *State* v. *Donahue*, 251 Conn. 636, 643–45, 742 A.2d 775 (1999) (*Terry* stop permitted under article first, §§ 7 and 9, of state constitution), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000); because they lacked a reasonable and articulable suspicion that he had committed or was about to commit a crime.[6] See *State* v. *Kelly*, supra, 129 Conn. App. 118. The defendant also asserted that the trial court's conclusion that the officers had stopped him as a reasonable safety measure was flawed for a second reason, namely, that it was based on the clearly erroneous factual finding that Gomez was the subject of an outstanding warrant for felony possession of a firearm when, in actuality, the testimony adduced at the suppression hearing established that the warrant was for a violation of probation that had been imposed for an unspecified felony conviction.

During the pendency of his appeal before the Appellate Court, the defendant moved for an articulation by the trial court of several of its factual findings. After the trial court denied the motion, the defendant filed a motion for review with the Appellate Court, which granted the motion in part and ordered, inter alia, that the trial court identify the offense alleged in the outstanding warrant for Gomez. In its articulation, the trial court reiterated that the warrant was for felony possession of a firearm.

On appeal, the Appellate Court concluded that the trial court properly had denied the defendant's motion to suppress. Id., 124. The Appellate Court commenced its analysis by rejecting the defendant's claim that his seizure violated the fourth amendment, explaining that, "[u]nder federal law, a person is seized by a show of authority only if he submits to it; *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991); which did not occur in the present case. Accordingly, the first seizure under the fourth amendment occurred when Rivera tackled the defendant. By the time that physical force was applied, Rivera had probable cause to believe that the defendant was engaged in criminal conduct when he fled and visibly tossed away a plastic bag [containing a white substance] while being pursued." *State* v. *Kelly*, supra, 129 Conn. App. 117 n.6.

With respect to the defendant's claim that his seizure violated article first, §§ 7 and 9, of the state constitution, the Appellate Court relied on *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992),[7] in concluding that the defendant was seized for state constitutional purposes when Rivera and Angeles drove up alongside him, displayed their badges, and Rivera told him to approach the vehicle. See id., 116–17. The Appellate

Court also concluded, however, that, even though Rivera and Angeles lacked reasonable and articulable suspicion to believe, at the time of that encounter, that the defendant was engaged in criminal activity, they nevertheless lawfully had detained him because the stop was reasonable, and therefore justified, under the state constitution. See id., 122–24. Like the trial court, the Appellate Court analogized the defendant's detention to the legitimate detention of a vehicle's passengers incident to the stop of the driver; see *Brendlin* v. *California*, supra, 551 U.S. 255–58; observing that, "[i]n the context of a traffic stop, the United States Supreme Court has taken the unprecedented step of authorizing seizures that are unsupported by any individualized suspicion whatsoever and [has] held that, during a traffic stop, an officer may also order any passenger out of the car as a precautionary [safety] measure." *State* v. *Kelly*, supra, 129 Conn. App. 119. The Appellate Court also likened the stop of a suspect's companion on a public street to the suspicionless detention of the occupants of a residence during the execution of a search warrant, which the United States Supreme Court declared to be constitutionally permissible in *Michigan* v. *Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). See *State* v. *Kelly*, supra, 122. The court ultimately concluded that, in light of the state's "weighty interest in promoting the safety of its police officers"; (internal quotation marks omitted) id., 118; and the minimal intrusion on the defendant's liberty interest; id., 123; it was reasonable for the officers to briefly detain the defendant for safety purposes incident to their investigative stop of Burgos.[8] Id., 124. Accordingly, the Appellate Court affirmed the trial court's judgment of conviction.[9] Id., 126.

This certified appeal followed. Following oral argument, this court, sua sponte, ordered the trial court to issue an articulation addressing two questions. First, "[u]pon reconsideration, and notwithstanding its finding that . . . Gomez was wanted for a felony firearms violation, did the trial court credit the testimony adduced at the hearing on the defendant's motion to suppress that there was an outstanding felony violation of probation warrant for Gomez?" Second, "[d]id the trial court credit the testimony that the police had received information from a reliable informant that Gomez might well be in possession of a firearm?" The trial court answered both questions in the affirmative.

In the present appeal, the defendant does not seriously contest the conclusion of the Appellate Court that he was not seized for fourth amendment purposes until the police had probable cause to arrest him and, therefore, that his seizure did not violate the federal constitution.[10] See *State* v. *Kelly*, supra, 129 Conn. App. 117 n.6. Relying on the fact that he was seized under the state constitution when the officers approached him and told him to stop, the defendant claims, rather, that the Appel-

late Court incorrectly concluded that article first, §§ 7 and 9, permit the police to detain an individual on a public street, even if the officers have no reason to believe that the individual has committed or is committing a criminal offense, if that individual is accompanied by a person whom the police have lawfully detained, and the police reasonably suspect that that other person is armed and dangerous. The defendant also claims that the Appellate Court, in concluding that the trial court correctly determined that Rivera and Angeles were justified in detaining the defendant, improperly relied on facts that the trial court had not expressly found. With respect to the defendant's first claim, we conclude that the state constitution permits the kind of brief, protective stop that occurred in the present case and, further, that the evidence supported the trial court's determination that the stop of the defendant was lawful. We also reject the defendant's second claim because it has been rendered moot by virtue of the trial court's response to this court's order for an articulation. We address each of the defendant's claims in turn.

I

The defendant contends that the Appellate Court incorrectly concluded that it is permissible under the state constitution for the police to briefly detain the companion of a suspect, incident to the lawful stop of that suspect, even though the police lack reasonable suspicion to believe that the companion himself has engaged or is engaging in criminal behavior. In support of this contention, the defendant argues that the state constitution does not permit the warrantless "seizures of citizens in public places except upon a particularized showing of suspicion of criminal activity" and that the mere geographic proximity of a companion to a suspect, however potentially dangerous that suspect may be, is insufficient, without more, to justify the stop of the companion. The state disagrees, asserting that, although no preexisting framework for evaluating the reasonableness of a state intrusion into a suspect's liberty under article first, §§ 7 and 9, expressly authorizes the suspicionless detention of a suspect's companion, such action is reasonably necessary, and therefore permissible under the state constitution, for the protection of the investigating officer when, as in the present case, that officer has lawfully stopped the suspect and has a reasonable concern for his safety. The state further asserts that "the governmental interests involved in 'companion' situations consistently will be so strong that this court should recognize a bright line rule to the effect that, when reasonable and articulable suspicion supports a stop of a suspect, the police reasonably may stop the companion of the suspect . . . ."[11] Although we decline to adopt the bright line rule proposed by the state, we agree with the state that, when officers lawfully detain a suspect who they reasonably believe poses a threat to their safety, article first, §§ 7 and

9, permit the officers to briefly detain the suspect's companion for protective purposes.

The defendant's claim requires us to examine the scope of the rights afforded by the Connecticut constitution. "It is well-established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher level of protection for such rights." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). In determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in *Geisler*. The factors that we consider are "(1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms." (Internal quotation marks omitted.) *State* v. *Dalzell*, 282 Conn. 709, 716 n.6, 924 A.2d 809 (2007). In addition, as we previously have noted, these factors may be "inextricably interwoven," and "not every [such] factor is relevant in all cases." *State* v. *Morales*, 232 Conn. 707, 716 n.10, 657 A.2d 585 (1995).

As to the first *Geisler* factor, namely, the relevant constitutional text, "this court repeatedly has observed that the language of article first, § 7, of the state constitution closely resembles the language of the fourth amendment to the federal constitution."[12] *State* v. *Davis*, 283 Conn. 280, 306, 929 A.2d 278 (2007). In light of this textual similarity, it is not surprising that, with respect to the second *Geisler* factor, namely, this state's precedent, we consistently have recognized that, "in determining whether article first, § 7, has been violated, we employ the same analytical framework that would be used under the federal constitution." (Internal quotation marks omitted.) Id., 310. Indeed, although we previously have held that, in some circumstances, article first, § 7, provides greater protections than those afforded under the federal constitution,[13] we also have observed that the standards governing our analysis for purposes of article first, § 7, "mirror those set forth by the United States Supreme Court . . . with regard to [federal] fourth amendment analysis . . . ." (Citation omitted.) *State* v. *Oquendo*, supra, 223 Conn. 654. Accordingly, we next consider the third *Geisler* factor, namely, relevant federal precedent, to determine whether the fourth amendment permits the protective stop of a suspect's companion when the police reasonably believe that the suspect is armed and dangerous. Because reasonableness is the touchstone of both the fourth amendment and article first, § 7, persuasive federal precedent applying that standard is particularly relevant to our state constitutional inquiry.[14]

The fourth amendment, like article first, § 7,[15] proscribes only "unreasonable" searches and seizures. U.S. Const., amend. IV; accord Conn. Const., art. I, § 7. A search or seizure is presumptively unreasonable when it is conducted without a warrant issued upon probable cause. See, e.g., *Katz* v. *United States*, 389 U.S. 347, 356, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). Nevertheless, several categories of searches and seizures have been deemed reasonable, and therefore lawful, even when officers lack probable cause or a warrant. See, e.g., *National Treasury Employees Union* v. *Von Raab*, 489 U.S. 656, 665, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989) ("neither a warrant nor probable cause . . . is an indispensable component of reasonableness in every circumstance"). For instance, under *Terry*, officers may temporarily seize an individual if they have a reasonable and articulable suspicion that he is involved in criminal activity. See *Terry* v. *Ohio*, supra, 392 U.S. 30–31. As the court stated in *Terry*, "we deal here with an entire rubric of police conduct—necessarily swift action predicated [on] the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the [f]ourth [a]mendment's general proscription against unreasonable searches and seizures." Id., 20. After balancing the state's legitimate interests in crime prevention and detection against a suspect's liberty interest; see id., 21–25; the court concluded that, when an officer has a reasonable basis for suspecting that an individual is committing or has committed a criminal offense, it is constitutionally permissible for the officer to briefly detain the individual for investigative purposes. Id., 30–31. An accompanying patdown search is similarly justified if the police also have a reasonable basis to believe "that the person stopped is armed and dangerous." *Arizona* v. *Johnson*, 555 U.S. 323, 327, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); see *Terry* v. *Ohio*, supra, 27, 30. This latter action does not violate the fourth amendment because of the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry* v. *Ohio*, supra, 23.

Since *Terry*, the United States Supreme Court has made it clear that an individual's mere geographic proximity to "premises where an authorized narcotics search is taking place" does not itself justify a patdown search of that individual because that proximity, without more, is insufficient to create a reasonable suspicion that he is armed and dangerous. *Ybarra* v. *Illinois*, 444 U.S. 85, 94, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979); see also *United States* v. *Jaramillo*, 25 F.3d 1146, 1152 (2d Cir. 1994) ("[t]he sole fact that an individual as to whom the officers have no reasonable and articulable

factual suspicion of wrongdoing happens to be in a public place where another person possesses a weapon or contraband does not provide a basis for a *Terry*-type search if the possessor is a person with whom the searched individual has no known connection"). Courts have applied this reasoning in concluding that the mere geographic proximity between an individual who officers reasonably suspect has committed or is committing a crime and his companion does not alone rise to the level of reasonable suspicion of criminal activity by the companion. See, e.g., *United States* v. *Black*, 707 F.3d 531, 539 (4th Cir. 2013); *United States* v. *Navedo*, 694 F.3d 463, 468–69 (3d Cir. 2012); *People* v. *Trapier*, 47 App. Div. 2d 481, 483–84, 367 N.Y.S.2d 276 (1975).

The mere fact that the suspicionless detention of a suspect's companion cannot be justified under *Terry* does not resolve the issue before us, however, because such a detention otherwise may be reasonable for fourth amendment purposes. Indeed, the United States Supreme Court has used the same balancing approach that it applied in *Terry* in concluding that certain warrantless searches and seizures pass muster under the fourth amendment even though they are not supported by probable cause or reasonable suspicion. For example, in *Michigan* v. *Summers*, supra, 452 U.S. 692, the court reasoned that *Terry*'s mandate of individualized suspicion is inapplicable to the detention of the occupants of a dwelling incident to the execution of a search warrant for those premises. See id., 701–705. In reaching its conclusion that such a seizure is permissible, the court explained that the state's interests in preserving evidence, preventing flight, and protecting officer safety outweighed the occupants' liberty interests. See id., 702–703; see also *Maryland* v. *Wilson*, 519 U.S. 408, 413–15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) (balancing state's interest in officer safety against individual's liberty interest and holding that officers, while performing traffic stop, may lawfully order passengers to exit vehicle, despite lack of suspicion that they are dangerous or engaged in criminal activity); cf. *Maryland* v. *Buie*, 494 U.S. 325, 333–36, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990) (balancing interests in officer safety and individual privacy and concluding that, when police enter premises to arrest suspect pursuant to warrant, and police have reasonable belief that potentially dangerous companions of suspect may be hiding nearby, police may conduct protective sweep of premises incident to execution of arrest warrant). Furthermore, we have used the same balancing test that the United States Supreme Court employed in *Terry* and *Summers* in concluding that an individual's suspicionless detention may be reasonable under the Connecticut constitution. See, e.g., *State* v. *Mikolinski*, 256 Conn. 543, 550, 554, 557, 775 A.2d 274 (2001) (applying reasonableness balancing test in holding that suspicionless sobriety checkpoints operated pursuant to neutral criteria are per-

missible under article first, §§ 7 and 9, of state constitution).

The Eleventh Circuit Court of Appeals recently applied this balancing approach in determining that the detention of the companions of two suspects "was reasonable, in light of the substantial risks to the officers' safety," despite a lack of individualized suspicion that the companions were involved in criminal activity. *United States* v. *Lewis*, 674 F.3d 1298, 1309 (11th Cir. 2012). In *Lewis*, two police officers encountered four men in a parking lot, one of whom was the defendant, Omar Oneil Lewis. Id., 1300. During a conversation with the men, the officers asked them whether they were carrying firearms. Id. Two of the men, not including Lewis, responded in the affirmative, and the police then brandished their weapons and ordered all four men to sit on the ground with their hands showing. Id., 1300–1301. The officers subsequently discovered a semiautomatic pistol underneath a vehicle parked near Lewis, whom they arrested and charged with carrying a concealed firearm. Id., 1301. The District Court subsequently granted Lewis' motion to suppress the pistol, reasoning that the police had illegally seized Lewis when they ordered him to the ground at gunpoint because, at the time, they lacked reasonable and articulable suspicion to believe that he had committed or was committing a criminal offense, and the pistol was a fruit of that unlawful seizure. Id., 1301–1302. The Eleventh Circuit reversed the District Court's ruling, concluding that, "for safety reasons, officers may, in some circumstances, briefly detain individuals about whom they have no individualized reasonable suspicion of criminal activity in the course of conducting a valid *Terry* stop as to other related individuals." Id., 1306. In balancing the safety interests of the officers against Lewis' liberty interest, the court concluded that it was reasonable for the police "to control the movements of nearby associates and exercise command over the situation once the officers had reasonable suspicion of criminal activity that warranted further investigation." Id., 1308. In arriving at this conclusion, the court focused on the specific dangers associated with firearms, explaining that "the very rationale underpinning *Terry*—the protection of officer safety and the safety of others nearby, especially from the dangers posed by firearms—[was] presented by the facts of [the] case." Id., 1309.

We agree with *Lewis* that, for purposes of the reasonableness requirement of the fourth amendment, the state's interest in officer safety is sufficiently compelling that, when officers have a reasonable concern for their safety while lawfully detaining a suspect, it is permissible for the officers to briefly detain the suspect's companion as a precautionary measure. As the court in *Lewis* recognized, "individualized suspicion is not an absolute prerequisite for every constitutional search or seizure." Id., 1305; see also *Samson* v. *Califor-*

*nia*, 547 U.S. 843, 855 n.4, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) ("[t]he touchstone of the [f]ourth [a]mendment is reasonableness, not individualized suspicion"). Although the protective stop of a companion authorized by *Lewis* does not meet the requirements for a *Terry* stop, ultimately, the determination of whether such a stop is reasonable for fourth amendment purposes entails a balancing of "the need to search [or seize] against the invasion which the search [or seizure] entails." (Internal quotation marks omitted.) *Terry* v. *Ohio*, supra, 392 U.S. 21; see also *State* v. *Wilkins*, 240 Conn. 489, 503, 692 A.2d 1233 (1997) (reasonableness is evaluated by measuring state's "intrusion on the individual's interests against its promotion of legitimate . . . governmental interests" [internal quotation marks omitted]). In evaluating the reasonableness of the protective stop of a suspect's companion, we therefore must consider the state's interest in officer safety in light of the companion's liberty interest.

To be sure, the fourth amendment guarantees all persons the right to be free from unwarranted police interference while on a public street, as in the present case, or elsewhere. A protective stop of the kind that occurred here, however, represents a relatively limited intrusion into that interest. A protective stop typically will be of short duration, and, unless the officer has reason to believe that the subject of the stop is armed, ordinarily, there will be no need for an accompanying patdown for weapons.[16] On the other side of the ledger, the state has a weighty interest in ensuring officer safety when an officer stops a suspect who he reasonably believes is armed and dangerous. Should an officer determine that it is necessary to detain a suspect in furtherance of a criminal investigation, the officer may well encounter one or more persons accompanying the suspect, and the presence of those companions both increases the possibility of interference with the officer's investigation and, as the Appellate Court observed, multiplies the sources of potential harm to the officer. See *State* v. *Kelly*, supra, 129 Conn. App. 122–23. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Terry* v. *Ohio*, supra, 392 U.S. 23. Consequently, the fourth amendment permits "swift action by police officers who, while conducting lawful investigations, find themselves in a position of imminent peril." *State* v. *Mann*, 271 Conn. 300, 315, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). Such action is permissible when, as the state contends occurred in the present case, an officer reasonably believes that, in order to avoid or defuse a potentially dangerous situation, he must take control of that situation by tem-

porarily maintaining the status quo.[17]

As we have indicated, our analysis comports with the reasoning of the United States Supreme Court that, in certain circumstances implicating police safety, it is constitutionally permissible for the police to detain an individual, even in the absence of particularized suspicion that the individual has engaged in criminal conduct. For example, the detention of a suspect's companion on a public street bears important similarities to the lawful detention of a vehicle's passengers incident to the stop of the driver. See *Brendlin* v. *California*, supra, 551 U.S. 256–57. In the same manner that a traffic stop curtails the freedom of a passenger, so, too, does the protective stop of a suspect's companion. Nevertheless, in the case of a traffic stop, an officer may detain the vehicle's passengers because "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (Internal quotation marks omitted.) Id., 258. Indeed, in the context of a traffic stop, the state's overriding interest in officer safety has been deemed to provide sufficient justification for the officer to order the passengers out of the vehicle without any individualized suspicion that those passengers pose a threat or otherwise were involved in conduct warranting their removal from the vehicle. See *Maryland* v. *Wilson*, supra, 519 U.S. 413–15; cf. *United States* v. *Vaughan*, 718 F.2d 332, 334–36 (9th Cir. 1983) (applying balancing test used by United States Supreme Court in *Summers* and concluding that brief, protective detention of passenger, who repeatedly attempted to walk away from vehicle, was lawful). Furthermore, the protective stop of a suspect's companion is analogous to a traffic stop of a vehicle with one or more passengers in that "a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing." *Brendlin* v. *California*, supra, 257.

In addition, as the Appellate Court explained; see *State* v. *Kelly*, supra, 129 Conn. App. 120; the holding in *Michigan* v. *Summers*, supra, 452 U.S. 705, permitting the detention of a dwelling's occupants during the execution of a search warrant at the dwelling provides further support for the conclusion that the protective stop of a suspect's companion incident to the lawful stop of the suspect does not violate the fourth amendment when the investigating officer has a reasonable concern for his safety. An officer who detains a suspect accompanied by a companion faces safety concerns similar to those that are present during the execution of a search warrant, especially when, as in the present case, the officer has reason to believe that the suspect is armed and dangerous: the companion's physical proximity to the officer and the suspect makes it very easy for the companion to interfere with the police investiga-

tion and to cause harm to the officer. The state's interest in mitigating this risk is substantial in both contexts and justifies police action without individualized suspicion. As this court previously has recognized, "the notion is abhorrent that police who are investigating a crime and suddenly find themselves at risk are precluded from acting reasonably in response to that risk merely because they have not yet established" the requisite level of cause to believe that a crime has been committed.[18] (Internal quotation marks omitted.) *State* v. *Mann*, supra, 271 Conn. 318.

We do recognize that some of the factors on which the court in *Summers* relied to support its conclusion that it is constitutionally permissible for the police to detain the occupants of a dwelling while executing a search warrant are not present in the case of a protective stop of the companion of a lawfully detained and potentially dangerous suspect. For example, when executing a search warrant for a dwelling, "[a] neutral and detached magistrate [has] found probable cause to believe that the law was being violated in that house and [has] authorized a substantial invasion of the privacy of the persons who [reside] there." *Michigan* v. *Summers*, supra, 452 U.S. 701. In addition, the detention of the dwelling's occupants usually is less intrusive than the scope of the judicially authorized search itself. Id. The fact that these considerations are not present in the case of a protective stop of a suspect's companion, however, does not render protective stops per se unreasonable; rather, it is reason for concluding that the permissible degree to which the state may intrude on a companion's personal liberty must be correspondingly circumscribed. Consequently, a protective stop must be limited, in both time and manner, to the minimum intrusion necessary for officers to reasonably ensure their safety. In addition, the propriety of the protective stop is contingent on the constitutional validity of the underlying seizure of the suspect, and the state must point to specific facts that support the conclusion that the safety concerns of the police officer involved in the protective stop were objectively reasonable.[19] When these requirements have been met, a protective stop is significantly less intrusive than the detention of a dwelling's occupants authorized by *Summers*; indeed, in stark contrast to a protective stop, a detention incident to the execution of a search warrant potentially could last for hours and could involve the use of significant physical restraints on the individual's liberty. See, e.g., *Muehler* v. *Mena*, 544 U.S. 93, 96, 100, 102, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) (reasonable to handcuff defendant for two to three hours during execution of search warrant); see also *State* v. *Read*, 132 Conn. App. 17, 21, 29 A.3d 919 (execution of search warrant lasted approximately eight to ten hours), cert. denied, 303 Conn. 916, 33 A.3d 740 (2011). Furthermore, unlike the preventive detention of a suspect's companion, the

police need not have a reasonable concern for their safety when detaining the occupant of a dwelling in accordance with *Summers*.[20] See *Michigan* v. *Summers*, supra, 703–704.

Thus, federal cases construing the fourth amendment's reasonableness requirement strongly support the conclusion that it is reasonable under article first, §§ 7 and 9, of the state constitution for the police to stop a suspect's companion, as a reasonable safety measure, when the police, having lawfully detained the suspect, reasonably believe that the suspect is armed and dangerous. We therefore turn to the remaining *Geisler* factors, none of which supports the defendant's claim.

As to the fourth *Geisler* factor, namely, persuasive sister state precedents, state courts invariably have concluded that a police officer, while lawfully detaining a suspect, also may briefly stop the suspect's companion when that stop is justified by considerations of officer safety. See, e.g., *Trice* v. *United States*, 849 A.2d 1002, 1006 (D.C. 2004) ("[d]espite the general rule, immediate safety concerns may justify police in stopping, or stopping and frisking, a person based on his association with someone else whom the police reasonably suspect of criminal activity"), cert. denied, 543 U.S. 1078, 125 S. Ct. 934, 160 L. Ed. 2d 820 (2005); *Commonwealth* v. *Rucker*, Massachusetts Superior Court, Docket No. 06-00530 (Mass. Sup. November 27, 2006) ("when an officer legitimately comes into contact with the companion of the target of a *Terry* stop, particularly when the stop is related to a crime of violence or involves firearms, [he] may [stop and] frisk the suspect's companion if [he] consider[s] [the companion] dangerous, even if [he does] not have reasonable, articulable grounds to stop [the companion] for suspicion of criminal activity"); *State* v. *Drury*, 358 S.W.3d 158, 163 (Mo. App. 2011) ("[p]rotective detention is reasonable when it is for a limited duration, and when the individual's presence could create a risk of harm to the officer, the individual detained, or the public at large, even if the officer has no reason to believe the individual would intentionally cause harm"), transfer denied, Missouri Supreme Court, Docket No. SC92290 (Mo. March 6, 2012); *State* v. *Sparr*, 13 Neb. App. 144, 153–55, 688 N.W.2d 913 (2004) (officer's actions were reasonable when, while seizing driver of one vehicle that already was stopped, he detained driver of nearby vehicle as safety precaution); see also *United States* v. *Maddox*, 388 F.3d 1356, 1367–68 (10th Cir. 2004) (permitting protective stop of arrestee's companions incident to his arrest when officers had reasonable safety concerns), cert. denied, 544 U.S. 935, 125 S. Ct. 1689, 161 L. Ed. 2d 504 (2005); cf. *People* v. *Samples*, 48 Cal. App. 4th 1197, 1206–1207, 56 Cal. Rptr. 2d 245 (1996) (using balancing test and concluding that, after defendant parked his vehicle without prompting, officers acted reasonably in detaining him incident to seizure of his passengers, whom officers reasonably

suspected had engaged in sale of narcotics, because state's interest in officer safety outweighed relatively minor limitation on defendant's liberty), review denied, California Supreme Court, Docket No. S056442 (Cal. December 18, 1996). Indeed, neither the defendant nor the dissent has identified a single case in which a court, either federal or state, has determined that such a protective stop of the companion was unreasonable.

Nevertheless, the defendant contends that the final potentially relevant *Geisler* factor, namely, sociological and policy considerations,[21] supports his claim that the state constitution precludes the protective stop of a suspect's companion. In essence, the defendant claims that permitting the police to conduct such a stop will lead to abuse by overzealous officers. We do not believe that any such risk outweighs the state's strong interest in officer safety. Moreover, to the extent that the defendant's concern may have some legitimacy, our courts are well equipped to address any claim of police impropriety with respect to the protective stop of a suspect's companion and to enforce the conditions that we have placed on such detentions by ensuring that the failure of the police to abide by those conditions in any given case does not go unremedied.

Thus, our review of the *Geisler* factors leads to only one conclusion: the defendant cannot prevail on his claim that the state constitution categorically bars the police from detaining a suspect's companion as a precautionary safety measure. On the contrary, it is reasonable, and therefore permissible, under article first, §§ 7 and 9, of the state constitution, for officers to briefly detain a suspect's companion incident to the lawful stop of the suspect when the officers reasonably believe that the suspect presents a threat to their safety.

Finally, the state maintains that the interest in officer safety is so weighty that we should go further and adopt a bright line rule pursuant to which it always is permissible for an officer to detain a suspect's companion, whenever the suspect is detained, regardless of whether the officer is reasonably concerned for his safety. We decline the state's invitation to adopt such a broad rule because we do not believe that it is necessary for the protection of the police, and, consequently, we are doubtful that it would satisfy the constitutional reasonableness requirement. For example, under the state's proposed standard, an officer could lawfully detain a suspect's companion even if the officer had no reason to believe that either the suspect or the companion posed any threat to the officer's safety. Similarly, an officer would be free to automatically detain a suspect's young child or a group of obviously disinterested bystanders, merely because of their physical proximity to the suspect, even though the officer could not articulate a rational justification for the detention.[22] Although it is true that an officer invariably may detain the passen-

gers of a car incident to the stop of the driver; see *Brendlin* v. *California*, supra, 551 U.S. 255–58; because of the nature of such a stop; see, e.g., *Pennsylvania* v. *Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (recognizing "the inordinate risk confronting an officer as he approaches a person seated in an automobile"); there will be some circumstances when it is not reasonable for an officer to detain a suspect's companion incident to the stop of the suspect. Consequently, we do not agree with the state that the generalized interest in police safety inevitably outweighs the companion's liberty interest. We are persuaded, rather, that permitting the protective stop of a suspect's companion when the officer has reason to be concerned for his safety strikes an appropriate balance between the competing state and individual interests.

## II

The defendant next claims that the Appellate Court incorrectly concluded that the trial court properly had found that Detective Rivera and Lieutenant Angeles were justified in detaining the defendant because they had a reasonable concern for their safety. In support of this claim, the defendant asserts that the trial court's conclusion was based on clearly erroneous factual findings and, further, that the Appellate Court ignored those erroneous findings and improperly upheld the trial court's ruling on the basis of facts that the trial court never found.

The record reveals the following additional facts and procedural history that are relevant to this issue. At the hearing on the defendant's motion to suppress the cocaine seized by the police following his detention incident to the stop of Burgos, Rivera testified that, shortly before the defendant's arrest, a confidential informant, who previously had provided accurate information about individuals in possession of firearms, told the police that Gomez, who lived in the Brown Street area of Hartford, likely was carrying a firearm. After receiving this information, Rivera discovered that "there was an outstanding felony violation of probation warrant" for Gomez. At the hearing, the defense conceded that the officers lawfully had stopped Burgos because they reasonably believed that he was Gomez and had a reasonable and articulable suspicion that Gomez had committed a criminal offense.

At the conclusion of the suppression hearing, the trial court made the following factual findings. "This [case] involves a series of events that happened on Brown Street, in Hartford, in the midday hours of March 27, 2007. The Hartford police had a warrant for . . . Gomez. *And this warrant was a felony warrant for possession of a firearm.* The police also had reason to believe that . . . Gomez was located in the Brown Street area of Hartford. The police went to this address—or went to this location—and saw walking

on the street two gentlemen, one of whom, although neither person was . . . Gomez—it happened that one person matched a physical description given to the police of . . . Gomez. And they did not have a photograph; they just had a physical description." (Emphasis added.) Thereafter, however, the Appellate Court, in upholding the trial court's denial of the defendant's motion to suppress, relied in part on testimony adduced at the suppression hearing establishing, first, that Gomez was the subject of an outstanding warrant for a violation of probation and, second, that the police had received information from a reliable confidential informant that Gomez was carrying a firearm. *State* v. *Kelly*, supra, 129 Conn. App. 112. Finally, while this appeal was pending, and in response to this court's order for an articulation, the trial court stated that it had credited the officers' testimony that there was an outstanding felony violation of probation warrant for Gomez, and that a reliable informant had told the police that Gomez was in possession of a firearm.

We agree with the defendant that the trial court's initial finding concerning the charge in the outstanding arrest warrant for Gomez, that is, felony possession of a firearm, was unsupported by the record because the unchallenged testimony adduced by the state established that Gomez was the subject of a warrant for an "outstanding felony violation of probation . . . ." As we have explained, however, in the trial court's articulation, which it issued during the pendency of the present appeal, the court reconsidered that initial finding and stated that it credited the suppression hearing testimony that Gomez had an outstanding felony warrant for a violation of probation. The trial court also stated that it credited the testimony that the officers had received information from a reliable confidential informant that Gomez likely was in possession of a firearm. In light of these factual findings by the trial court, the defendant's claim that the Appellate Court improperly relied on certain erroneous factual findings is moot.[23] Furthermore, as the Appellate Court explained, the evidence was sufficient to support a reasonable belief by Rivera and Angeles that Gomez was armed and dangerous. Finally, the defendant himself conceded that Rivera and Angeles lawfully had stopped Burgos because they reasonably believed that he was Gomez, for whom they had an arrest warrant, when they observed Burgos on Brown Street. For the reasons set forth in part I of this opinion, the facts also support the conclusion of the trial court and the Appellate Court that Rivera and Angeles reasonably detained the defendant, as a legitimate safety precaution, incident to the stop of Burgos, even though they lacked any individualized suspicion to believe that the defendant himself was involved in criminal activity or was armed and dangerous.

III

In sum, we agree with the Appellate Court that "the interest in the officers' safety during the investigatory stop of Burgos outweighed the defendant's personal liberty interest in not being inconvenienced. To mitigate the risk of harm, the officers exercised command of the entire scene, including the defendant. See, e.g., *Michigan* v. *Summers*, supra, 452 U.S. 702–703. When making a 'split second' decision, an officer is 'not required to calculate the probability that the defendant would proceed in a certain way before taking reasonable steps to protect himself and his fellow officers.' *State* v. *Mann*, supra, 271 Conn. 328. For example, when making a suspicionless detention of a passenger during a traffic stop, a police officer 'surely [is] not constitutionally required to give [the defendant] an opportunity to depart the scene after he exit[s] the vehicle without first ensuring that, in so doing, [he is] not permitting a dangerous person to get behind [him].' *Arizona* v. *Johnson*, [supra, 555 U.S. 334]. Similarly, for example, in determining the reasonable duration of an investigative stop, a court 'should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.' *United States* v. *Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). The risk in the present case was significant, and the incremental intrusion was minimal." *State* v. *Kelly*, supra, 129 Conn. App. 124. Accordingly, the protective stop of the defendant incident to the stop of Burgos did not violate the defendant's rights under the state constitution, and, therefore, the Appellate Court properly upheld the trial court's ruling that the defendant is not entitled to suppression of the cocaine that the police had seized following his detention.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and NORCOTT, ZARELLA and VERTEFEUILLE, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[2] We note that the trial court's finding that Gomez had an outstanding warrant for the offense of "felony . . . possession of a firearm" was incorrect. Rather, the undisputed testimony, elicited from Angeles, reflects that Gomez was the subject of an "[a]ctive felony warrant for . . . a violation of probation . . . ." As we explain more fully hereinafter, however, this error is harmless because the trial court subsequently issued an articulation that included a correction of its erroneous finding concerning the nature of the offense alleged in the warrant. See part II of this opinion.

[3] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[4] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[5] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[6] In *Terry*, the United States Supreme Court held that police may detain an individual when the following three conditions are met: "(1) the officer must have a reasonable suspicion that a crime has occurred, is occurring, or is about to occur; (2) the purpose of the stop must be reasonable; and (3) the scope and character of the detention must be reasonable when considered in light of its purpose." *State* v. *Cyrus*, 297 Conn. 829, 837, 1 A.3d 59 (2010).

[7] In *Oquendo*, this court held that, in contrast to fourth amendment jurisprudence, "a consensual encounter becomes a seizure [under article first, § 7, of the Connecticut constitution] if, on the basis of a show of authority by the police officer, a reasonable person in the defendant's position would have believed that he was not free to leave." *State* v. *Oquendo*, 223 Conn. 653.

[8] In reaching its conclusion, the Appellate Court relied on certain testimony that the state had adduced at the suppression hearing but which the trial court initially did not expressly credit or otherwise mention. In particular, the Appellate Court's conclusion was predicated on testimony that the police were reliably informed that Gomez was in possession of a firearm and that he was the subject of an outstanding arrest warrant for a violation of probation. *State* v. *Kelly*, supra, 129 Conn. App. 112. In focusing on that testimony, the Appellate Court essentially disregarded the trial court's erroneous finding that there was an outstanding warrant for Gomez for felony possession of a firearm. See footnote 2 of this opinion. As we discuss in this opinion, during the pendency of the present appeal, the trial court issued an articulation indicating that it also had credited the same testimony on which the Appellate Court's recitation of the facts was predicated. See part II of this opinion.

[9] On appeal to the Appellate Court, the defendant also asserted that the trial court improperly allocated the burden of proof to him for purposes of the motion to suppress when, in fact, it is the state's burden to establish that a warrantless search or seizure is constitutionally permissible. See *State* v. *Kelly*, supra, 129 Conn. App. 125–26. The Appellate Court rejected that claim; id., 126; and it is not at issue in this certified appeal.

[10] Indeed, the defendant would have no reasoned basis on which to disagree with that determination by the Appellate Court.

[11] The state also contends that the defendant's seizure was lawful because Rivera and Angeles had a reasonable suspicion that the defendant himself was engaged in criminal conduct when they ordered him to approach their car. We need not address this claim in light of our determination that the brief detention of the defendant incident to the lawful stop of Burgos constituted a reasonable safety precaution.

[12] See footnotes 3 and 4 of this opinion.

[13] See, e.g., *State* v. *Oquendo*, supra, 223 Conn. 649–50, 652 (declining to adopt, for purposes of state constitution, fourth amendment principle that seizure of individual does not occur until individual submits to show of authority); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (declining to recognize, for purposes of state constitution, good faith exception applicable to fourth amendment exclusionary rule).

[14] Consequently, our discussion of federal precedent is significantly more extensive than our discussion of the other, less relevant *Geisler* factors.

[15] We note that the defendant asserts that article first, § 9, of the state constitution provides protections greater than those afforded under article first, § 7, because article first, § 7, grants rights to the "people," whereas article first, § 9, uses the singular term "person" in describing its protections. We reject the defendant's claim with respect to the alleged import of this

minor linguistic difference in the two provisions because, as we previously have observed, "in the search and seizure context, article first, § 9, is our criminal due process provision [and] does not provide protections greater than those afforded by either the fourth amendment or its coordinate specific state constitutional provision, article first, § 7." *State* v. *Jenkins*, 298 Conn. 209, 259 n.39, 3 A.3d 806 (2010).

[16] We note that some courts have adopted the so-called automatic companion rule, under which officers may conduct a patdown search of the companion of a lawfully detained suspect even though the officers lack a reasonable suspicion to believe that the companion is armed and dangerous. See, e.g., *United States* v. *Poms*, 484 F.2d 919, 922 (4th Cir. 1973); *United States* v. *Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971); *State* v. *Clevidence*, 153 Ariz. 295, 298, 736 P.2d 379 (App. 1987). But see *United States* v. *Bell*, 762 F.2d 495, 499 (6th Cir.) (rejecting automatic companion rule and stating that it did "not believe that the *Terry* requirement of reasonable suspicion . . . ha[d] been eroded to the point that an individual may be frisked based [on] nothing more than an unfortunate choice of associates" [citation omitted]), cert. denied, 474 U.S. 853, 106 S. Ct. 155, 88 L. Ed. 2d 128 (1985). Although we need not reach this issue for purposes of the present appeal, it is questionable whether such a rule would satisfy the reasonableness requirement of the fourth amendment. See *Arizona* v. *Johnson*, supra, 555 U.S. 326–27 (under *Terry*, patdown search of suspect who has been lawfully stopped on basis of reasonable and articulable suspicion cannot also be frisked unless police reasonably suspect that suspect is armed and dangerous).

[17] To conclude otherwise would enable a suspect's companion to walk away from the officer, and out of his line of sight, while the officer is confronting the armed and dangerous suspect. If the companion is allowed to walk away, he easily could be out of the officer's view in a few short steps, and, in order to keep track of the companion—whose relationship to the suspect provides strong reason for the officer to keep the companion in his sight until the officer gains sufficient command of the situation—the officer would have to divert his attention from the suspect. This is an untenable position in which to place the officer, who must be able to devote his full attention to the dangerous suspect. We therefore reject the dissent's contention that, instead of briefly detaining the defendant, the police "had to request that the defendant leave while they detained the suspect." We are fully persuaded, rather, that the officer, and not the companion, must be permitted to control the situation by detaining the companion briefly for the purpose of avoiding the potentially catastrophic consequences that might result if the officer were denied the right to keep the companion in his sight while dealing with the suspect. Notably, the dissent does not explain how an officer may reasonably ensure his safety if he is unable to monitor the activities of the companion while he is confronting the dangerous suspect.

[18] The defendant and the dissent indicate that *Summers* provides little or no support for the conclusion that a protective stop is permissible under the fourth amendment because the court in *Summers* observed that the search warrant itself provided an objective basis for believing that the dwelling's occupants were involved in criminal activity, and that belief provided a basis for the detention of the occupants. See *Michigan* v. *Summers*, supra, 452 U.S. 703–704 ("The existence of a search warrant . . . provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of [the] occupant." [Footnote omitted.]). This, however, was only one of several justifications for the detention of the occupants in *Summers*, the holding of which was predicated on balancing the various "special law enforcement interests" implicated when a search warrant is executed, including officer safety, and the relatively limited intrusion on the occupants' liberty interests occasioned by the detention. See id., 699–704. Indeed, the court in *Summers* made it clear that the "central inquiry under the [f]ourth [a]mendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security," *not* individualized suspicion. (Internal quotation marks omitted.) Id., 700 n.11.

[19] Thus, contrary to the assertion of the dissent, our decision does not give rise to any "unconscionable ramifications . . . ." In support of this

assertion, the dissent posits a number of hypothetical scenarios and suggests that, in each such situation, the state might seek to rely on our holding in the present case to justify the detention of persons based solely on their proximity to an armed and dangerous suspect. The dissent's concern appears to be based on the fact that "[t]here simply is no definition of who is a 'companion' in the majority opinion." Although the present case does not require us to define "companion"—because the defendant makes no claim that he and Burgos were not companions—it suffices to say that the police may detain a person in the belief that that person is accompanying an armed and dangerous suspect only if that belief is based on reasonable and articulable facts. In other words, the police must reasonably believe that the person is accompanying the suspect. Because the police must abide by this reasonableness standard, the dissent's concern that our decision might somehow authorize the police to detain one or more persons merely because of their proximity to the suspect, and without regard to whether the facts give rise to the justified belief that any such person or persons were accompanying the suspect, is unfounded.

[20] The defendant asserts that, in contrast to the duly authorized search of the dwelling in *Summers* and the lawful stop of the vehicle in *Brendlin*, the police have no such preexisting and independent justification for initiating an intrusion into the liberty interest of a suspect's companion. According to the defendant, this distinction leads to the conclusion that an officer may detain the companion only if he has an individualized and reasonable suspicion that the companion has committed or is committing a criminal offense. Contrary to the defendant's claim, the protective stop of the companion is indeed dependent on prior, lawful police action: in the same manner that an officer lawfully detains the passengers of a motor vehicle when he has sufficient cause to stop the driver; see *Brendlin* v. *California*, supra, 551 U.S. 255–58; the protective stop of a suspect's companion is predicated on, and justified by, the lawful stop of a suspect who the police reasonably believe is armed and dangerous.

In addition, although we disagree generally with the dissent's analysis of the relevant case law, we are particularly puzzled by the dissent's reliance on *Ybarra* v. *Illinois*, supra, 444 U.S. 85, and its progeny. In *Ybarra*, the court held that the police were not entitled to *search* a person who merely was present in a bar that was the subject of a search warrant. Id., 88, 94, 96. Subsequently, however, in *Michigan* v. *Summers*, supra, 452 U.S. 705, the court made it clear that the police are authorized to *detain* a person who, like the defendant in *Ybarra*, is present on the premises during the execution of a search warrant for those premises. Because our decision in the present case permits only the brief *detention* of the defendant and does not entail or authorize a *search* of the defendant, *Ybarra*, in contrast to *Summers*, has little or no bearing on the outcome of the present case. Perhaps even more important, however, the dissent, in asserting that *Ybarra* provides the "appropriate framework" for purposes of the present case, ignores the fact that, as the United States Supreme Court made clear in *Summers* and, thereafter, in *Wilson* and *Buie*, a person may be detained without particularized suspicion of criminal activity when the detention is reasonable, and therefore justified for fourth amendment purposes, in the interest of officer safety. As we explained, in determining the constitutional propriety of such an intrusion, we must balance the state's interest in police safety against the individual's liberty interest, with due regard for the nature and extent of the intrusion. In the present case, the dissent fails to explain why the state's interest in the safety of the investigating officers did not outweigh the relatively minimal intrusion into the defendant's liberty interest. We note, finally, that the dissent's reliance on *United States* v. *Navedo*, supra, 694 F.3d 463, is similarly misplaced because the court in that case simply concluded that the detention of the defendant, Alexander Navedo, was impermissible under *Terry* and never considered the argument—because the government did not make it—that Navedo's detention was a reasonable protective stop. See id., 468–69.

[21] The defendant does not contend that the fifth *Geisler* factor, the historical underpinnings of article first, § 7, provides support for his claim.

[22] We recognize, of course, that there frequently are safety risks when an officer detains a suspect in a public setting, and that the protective stop of the suspect's companion often will be warranted. Moreover, in posing the foregoing examples, we do not suggest that any particular category of companion necessarily is immune from a protective stop. Our point, rather, is simply that, when an officer detains a suspect's companion incident to the stop of the suspect, the officer must have a legitimate reason for doing so.

[23] The defendant also claims that the Appellate Court improperly relied on other facts that, although the subject of testimony at the suppression hearing, the trial court never expressly found. Those facts are that the defendant clutched at his waistband, that Gomez sometimes disguised himself by wearing a wig, and that the stop of Burgos and the defendant occurred near a gas station located in an area known for drug dealing. See *State* v. *Kelly*, supra, 129 Conn. App. 112–13. For purposes of resolving the issue presented by this appeal, however, it is irrelevant whether the Appellate Court relied on those facts because other facts that the trial court found and on which the Appellate Court relied, namely, that the police had a felony arrest warrant for Gomez and had been told by a reliable informant that Gomez likely was carrying a firearm; id., 112; were sufficient to support the conclusion that Rivera and Angeles had a reasonable belief that Gomez was armed and dangerous.

————————————————————